## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 29 2018, 5:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

William Levi Abel,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 29, 2018

Court of Appeals Case No.
18A-CR-857

Appeal from the Greene Circuit Court

The Honorable Erik C. Allen, Judge

Trial Court Cause No.
28C01-1702-MR-1

**Darden, Senior Judge.**

# Statement of the Case

[1] William Levi Abel primarily appeals his conviction of murder, a felony.[1] However, he also appeals the eighty-year aggregate sentence the trial court imposed following his convictions of murder; obstruction of justice, a Level 6 felony;[2] theft, a Level 6 felony;[3] and, a firearm sentencing enhancement.[4] We affirm.

# Issues

[2] Abel raises three issues, which we restate as:

  I.  Whether the State presented sufficient evidence to rebut Abel's claim of self-defense.

  II. Whether the trial court abused its discretion at sentencing.

  III. Whether Abel's sentence is inappropriate in light of the nature of the offense and the character of the offender.

# Facts and Procedural History

[3] In January 2017, twenty-one-year-old Chase Aliano lived with his mother, Bambi Aliano, in Lawrence County. He drove a red Chevrolet Tracker vehicle.

---

[1] Ind. Code § 35-42-1-1 (2014).

[2] Ind. Code § 35-44.1-2-2 (2014).

[3] Ind. Code § 35-43-4-2 (2014).

[4] Ind. Code § 35-50-2-11 (2016).

Chase enjoyed shooting guns, and his family and friends were aware that he kept several firearms in his car, including a .40 caliber handgun, a .44 caliber handgun, a shotgun, and a .22 caliber AR rifle. In addition, Chase's friends knew that he used and sometimes sold controlled substances, including methamphetamine.

[4]     Also, in January 2017, twenty-four-year-old William Abel lived with his parents, John and Kay Abel, and other family members on the family's 211-acre farm in Greene County. The family lived in a large house, but there was also a cabin on the property. The cabin was located a quarter of a mile from the house in a wooded portion of the property, but it did not have electrical service. John and Kay had previously kicked Abel out of their house, but he moved back in 2016 while they were on vacation, and they were afraid to ask him to leave again. Tr. Vol. 3, p. 126. Abel used speed, a form of methamphetamine. He had not maintained had a regular job in nine months, and he did not have a drivers' license.

[5]     Chase and Abel had met in 2016 through a mutual friend. On January 27, 2017, Chase arrived at the farm to visit Abel. Abel had previously told Lynn Alexander, who also lived in the Abels' house, that he needed money for Chase, and Alexander gave Abel $200 before Chase arrived. Chase brought methamphetamine with him and smoked it with Abel and Alexander in Abel's room. Chase and Abel were friendly to one another and talked about guns. Chase left the house early in the morning on January 28, 2017.

[6] Abel had dated Tina Holland for several years, but she had ended their relationship in December 2016. Abel continued to call and text Holland even though she had told him that she did not want to communicate with him anymore. He told Holland that he wanted her to visit him at the farm on his birthday, January 30, 2017. In addition, Abel told his parents that Holland was coming to visit on that day, and he cleaned up his bedroom. Holland initially told him she would come to visit with him but later told him that she had changed her mind. Abel became "really upset." Tr. Vol. 4, p. 177. Holland stated that had never heard that kind of language coming from him before.

[7] Abel's father, John, noticed that Abel appeared depressed after Holland decided not to visit, and Abel wrote Tina's name on "[j]ust about everything up in his room." Tr. Vol. 3, p. 88. Kay later stated, "[Y]ou can't imagine how many times Tina was written on something." Tr. Vol. 3, p. 140. Alexander noticed Abel "was acting paranoid" and was angry. Tr. Vol. 4, p. 142.

[8] On January 31, 2017, Chase and Abel exchanged twenty-nine text messages between 9:24 p.m. and 11:41 p.m. The contents of the messages have not been included in the record. In addition, there were seven mobile phone calls between the two men that evening, starting at 9:14 p.m. and ending at 11:17 p.m.

[9] That same evening, Chase spoke with his friend, Riley Donica, and told him he was going to sell his .44 caliber handgun to "Billy Abel." Tr. Vol. 2, p. 223. Donica asked Chase to meet him and others later at a bar to celebrate another

friend's birthday. Chase agreed to meet Donica after the sale. In addition, Chase told Bambi, his mother, that he was going to Greene County to sell a handgun and would then return to Lawrence County to attend a friend's birthday party. Chase left his mother's house at 10:45 p.m.

[10] Chase and Donica continued to communicate through a social media messaging website on the night of January 31, 2017, until around eleven o'clock; after which Chase stopped sending messages and did not respond to Donica's messages. Chase's other friends also sent him numerous messages, to which he failed to respond. Chase never appeared at the birthday celebration.

[11] On the night of January 31, 2017, Abel's father, John, saw Abel leave the house at 11:30 p.m. and get into a vehicle. John could not identify the vehicle or the driver because it was dark outside, but he saw the vehicle's taillights as it drove through a field on the farm. John did not see Abel again until 8:00 a.m. the following morning, when Abel entered the house as John was eating breakfast. Later that day, Abel and John went to a store, where Abel purchased .40 caliber, .44 caliber, and .22 caliber ammunition. Abel paid with cash. During the trip to the store, Abel told John that he had traded with someone for several handguns.

[12] Within a few days after January 31, 2017, Abel texted Holland photographs of Chase's Tracker and of Chase's .44 caliber handgun. Abel indicated he wanted her to have the vehicle and the handgun. She asked him to text her a photograph of the Tracker's title, however, the title he texted her was for a

different vehicle. Holland knew Abel did not have a job, and she was concerned that his possession of the Tracker may not have been "legal." Tr. Vol. 4, p. 179. In the past, Holland had told him that she liked handguns and wanted to own a four-wheel-drive vehicle, and she thought Abel may have been offering her those items to encourage her to "start coming around" again. *Id.* at 182.

[13] On February 2, 2017, Abel texted a neighbor, William Schulz, to tell him he was putting scopes on several guns, including a .44 magnum handgun. He texted Schulz a picture of a rifle. Abel further told Schultz he had received a great deal on the guns and had purchased every gun that the seller had owned.

[14] Shortly after January 31, 2017, Abel's father, John, noticed his tractor was missing, and he asked Abel about it. Abel told him he had driven the tractor down to a pasture on the farm to help move a Chevy Tracker, which Abel claimed had broken down while he and Chase were "doing donuts in the field." Tr. Vol. 3, p. 93. John found the Tracker at the rear of his barn, in a spot that was not visible from the house or the nearby road. At that time, the Tracker did not have a license plate on it. Abel told John and Kay that he was waiting for Chase to return with a part to fix the Tracker. Abel further told John, but not Kay, that Chase was in Indianapolis "with his girlfriend getting more drugs." *Id.* at 98.

[15] John wrote down the Tracker's vehicle identification number (VIN) and gave it to Kay. Kay shared the VIN with a friend and asked the friend to find out

whether the vehicle was stolen. The friend told John and Kay that the Tracker was registered to Chase Aliano.

[16] Sometime between January 31 and February 3, 2017, Abel had entered the house and told John he thought there was a drone following him and that he was worried "cops could hear through the walls." *Id.* at 104. John suspected Abel was under the influence of controlled substances.

[17] On the evening of February 3, 2017, Bambi called Chase's father, Steve Aliano, to tell him she was deeply concerned because she had not heard from Chase since January 31, 2017. She further told Steve that Riley Donica had told her that Chase had not contacted him either since January 31, 2017. Chase's absence and failure to communicate was highly unusual. Steve had electronic access to Chase's mobile phone records. As he prepared to access the records, Steve called Donica, who told Steve that on the night of January 31, 2017, Chase had gone "to Billy Abel's house to sell him a .44 magnum" handgun. Tr. Vol. 2, p. 161.

[18] Steve learned from Chase's mobile phone records that Chase had repeatedly called and texted one particular number on the evening of January 31, 2017. The records further showed that Chase had sent a text to the same number at 11:41 p.m. on that night, and then there were no further calls or texts to or from Chase's mobile phone. Steve did not recognize the number, so he placed a call to it.

[19]     Abel answered Steve's telephone call and identified himself. Steve asked Abel if Chase had been at his home on January 31, 2017, and Abel told him that Chase had never arrived at the farm. Upon further questioning by Steve, Abel stated Chase had called him to say that he needed to go help a "girl" who had called Chase and told him her "vehicle broke down." *Id.* at 164. Abel further stated he had been trying to contact Chase without success. Steve knew from reviewing Chase's mobile phone records that Chase had not received a call from an unknown female during the period of time Abel said the call had occurred.

[20]     Meanwhile, Donica also called Abel on February 3, 2017. Abel told him that Chase had never arrived at the farm but had instead called Abel to tell him he needed to go help a girl whose car had broken down. Abel further stated that Chase had borrowed one of his handguns, and he did not "want that gun involved in something." *Id.* at 228.

[21]     Meanwhile, also on the evening of February 3, 2017, Abel told his parents that he needed to move the Tracker because Chase called and told him that Chase's mother, Bambi, was angry. Abel further told his parents that Chase wanted Abel to hide the Tracker so that Chase's mother could not find it. Abel later admitted to law enforcement that he had in fact wanted to hide the Tracker because he knew the police would soon be looking for it. John and Abel used John's tractor to tow the Tracker down a hill to a concealed location. John was not happy about hiding the Tracker, but Abel convinced him that Chase wanted

them to do it. Next, Abel further attempted to hide the Tracker by concealing it behind a mattress, a pallet, and other debris.

[22] Steve, who lived in Lawrence County, called the Lawrence County Sheriff's Department (LCSD) on the evening of February 3, 2017, to file a missing person's report for Chase. A sheriff's deputy arrived at Steve's house. The deputy spoke with Steve and took photographs of Chase's telephone records.

[23] After speaking with Steve, the deputy requested a Lawrence County dispatcher to contact the Greene County Sheriff's Department (GCSD) to send officers to Abel's house to search for Chase and the Tracker. Greene County Sheriff's Deputies Bobby Pierce and Davis Arne arrived at the Abels' farm at 4:49 a.m. on February 4, 2017.

[24] Abel spoke with the deputies, and Deputy Pierce recorded their conversation. Abel told the deputies he knew they were looking for Chase. He further stated that Chase had arrived at his family's farm on the evening of January 31, 2017. According to Abel, he had purchased controlled substances from Chase in the past, and on the night of January 31, he and Chase met in a field on the property and talked about buying more controlled substances. Abel stated that he gave Chase money for drugs, and Chase left to go to Indianapolis to make the purchase. In addition, Abel further told the deputies that he had lied to Chase's father when he said that Chase had not been at the farm on January 31, 2017. Abel explained he did not want to tell Steve about Chase's involvement in controlled substances. Abel further told the deputies that he had repeatedly

called Chase since January 31, 2017, but he had not made contact with Chase. Abel never mentioned that he had argued or fought with Chase after they met, and the deputies did not see any injuries on Abel.

[25] Deputy Pierce contacted the LCSD to report his conversation with Abel. Captain Andrew Phillips of the LCSD called Abel at 7:45 a.m. on February 4, 2017, to ask him to come to the sheriff's office to answer questions and provide a statement. John drove Abel to the office, and they arrived at 9:00 a.m. that morning. Abel continued to tell John that he believed Chase was in Indianapolis.

[26] Captain Phillips interviewed Abel outside of John's presence and recorded the interview using his body camera. He advised Abel that he was not in custody and was free to leave at any time. During the interview, Phillips typed a statement for Abel to review and sign. Abel told Phillips that he had been purchasing controlled substances from Chase about once a month for the prior six months. Abel further stated that Chase arrived at the farm in a red Chevrolet SUV on the night of January 31, 2017, for a potential gun sale. Abel stated the two met in a field and smoked "speed" together. Tr. Vol. 6, State's Ex. 11, at 3:26. Abel told Phillips that after further discussion, Chase decided not to sell his handgun to Abel. Instead, they agreed that Chase would put a scope on Abel's .357 Smith & Wesson handgun.

[27] Abel further stated that Chase accepted $350 from him to go to Indianapolis to buy more controlled substances. According to Abel, Chase left with Abel's

money and Abel's handgun, and Abel never saw him again. Abel also told Phillips that Chase had mentioned that he planned to meet some friends at a bar after he went to Indianapolis. Abel denied arguing or fighting with Chase on January 31, 2017; however, he told Phillips that in late autumn 2016, Chase had taken money from him, supposedly to buy controlled substances, and had then failed to contact him for a month.

[28] In addition, Abel conceded he had lied to Steve and to one of Chase's friends when he told them that Chase had never arrived at the farm on January 31, 2017. Abel told Phillips that Chase might be staying with a woman. In addition, he expressed concern that Chase had not returned his handgun. Abel described for Phillips several guns that he said Chase always had with him, including a .44 caliber handgun and an AR-15 rifle.

[29] After the interview, Phillips attempted to locate Chase's mobile phone by using cell phone towers to triangulate the mobile phone's signal. Phillips learned the mobile phone had last sent a signal from an area in Greene County. Next, at 3:18 p.m. that day, he contacted the GCSD and requested that someone be sent to search for Chase's phone in that area.

[30] At some point on February 4, 2017, Abel had called Holland and informed her the police had contacted him about the Tracker. According to Holland, Abel was "really upset," and he told her "none of this would have happened if you'd just came [sic] and saw me, I did this for you." Tr. Vol. 4, p. 183. At that

moment, Holland believed that Abel might have stolen the gun and the Tracker.

[31]     At 4:43 p.m. on February 4, 2017, Green County Sheriff's Deputies Anthony Pope and Blake McKamey were dispatched to an area identified by Captain Phillips to search for Chase's mobile phone. The Abels' farm was in the tracked area to be searched. The deputies went to the Abels' house and spoke with Abel and John. During the discussion, Abel admitted the Tracker was on the farm. John gave the deputies permission to view the vehicle. They found the Tracker in a sunken area of the farm, behind a mattress, a pallet, and brush. In addition, someone had put a license plate on the vehicle. The deputies notified a Greene County detective of their discovery and cordoned off the area.

[32]     At that point, Deputy Pope spoke with Abel again, recording the conversation. Abel stated that Chase's car had broken down while the two were driving across the field. Abel insisted he had offered to help Chase fix the vehicle on the night of January 31, 2017, but Chase instead called an unidentified female to come get him and told Abel he would return later.

[33]     Abel further stated that Chase had told him he was in trouble with the law. Deputy Pope noted that the vehicle had a lot of body damage. Abel conceded that he tried to hide the Tracker because he was scared. Deputy Pope noticed that Abel's "body language was just off" and that Abel did not seem concerned about Chase's whereabouts. Tr. Vol. 3, p. 53. Abel did not indicate that he and Chase had fought, and Abel showed no signs of injury.

[34]   Next, detectives from both Greene County and Lawrence County arrived at the Abel farm. Detective Tyler Phillips of the LCSD ran the Tracker's license plate through online records, which revealed that the plate was not registered to the Tracker but to a different person and vehicle. Next, Detective Phillips then looked up the Tracker's VIN, and the records showed that the VIN was registered to Chase Aliano. The officers noted that someone had removed the roof rack from the Tracker.

[35]   Detective Phillips and Detective Sergeant James O'Malley of the GCSD took Abel to the GCSD's office for questioning. The recorded interview began around 9:00 p.m. on February 4, 2017. The detectives read Abel an advisement of his rights, he indicated he understood, and he signed the advisement.

[36]   Initially, Abel told the detectives that Chase arrived at his house in the red Chevrolet Tracker at 10:30 p.m. on "Monday or Tuesday" to show him a .44 magnum Ruger handgun for a possible sale. Tr. Vol. 6, State's Ex. 17, at 2:40. Abel further stated that Chase told him he had no paperwork or receipts for the handgun and Abel decided not to buy it because he was concerned it might be stolen. The handgun allegedly had a laser scope that Abel admired, and Abel stated that they agreed Chase would sell the scope to Abel for $150 and, further, that Chase would install it on Abel's .357 magnum handgun. Abel further told the detectives that Chase also offered to purchase controlled substances for them if Abel gave him additional money.

[37] According to Abel, the two men shot firearms in several locations on the farm as they talked. Chase had brought with him a .40 caliber handgun along with the .44 caliber handgun. Abel told the detectives that he and Chase smoked speed together and drove across the field in the Tracker. He further stated the Tracker broke down in a rugged part of the farm, and that he had offered to help fix it that night. Chase purportedly declined Abel's offer and instead called a "girl" to come pick him up. *Id.* at 6:30.

[38] Abel claimed that after Chase made a mobile phone call, an unknown female arrived in a white Pontiac sedan and parked in a field on the farm. Abel stated that he did not know how the female knew where to find them on the farm. Abel told the detectives that he then brought a tractor down to the Tracker, and Chase loaded up the tractor with his possessions. Abel stated he saw an AR-15 rifle, a shotgun, handguns, and tools among Chase's possessions. Next, Abel told the detectives he drove the tractor to the woman's car, and Chase put his personal property inside her car.

[39] Abel further told the detectives that when Chase left with the unknown female, he took with him Abel's .357 caliber handgun to install the scope on it. Abel further stated he gave Chase $350 to go to Indianapolis to buy controlled substances. According to Abel, Chase was supposed to go Indianapolis and come back with more controlled substances and the part they needed to fix the Tracker.

[40] Abel next stated that Chase called him the next day at approximately 3:30 or 4:00 from a different phone number. According to Abel, Chase said he was not coming back because he needed to go "MIA" for a while with the woman, and he asked Abel to look after the Tracker. *Id.* at 10:28. Abel further stated that Chase then told him that the Tracker was stolen and that, if he told anyone about the Tracker, Chase would tell the police that Abel had stolen the Tracker.

[41] In addition, Abel told the detectives that he took the Tracker back to the barn and tried to fix it. He asserted he got the Tracker running and drove it back out into the field, where it broke down again. Next, Abel told the detectives he attempted to hide the Tracker in a low area on the farm behind a mattress and pallet after he heard that the police were coming to the property.

[42] Abel told the detectives that they would likely find shell casings near the cabin on the property. He also claimed that Chase had sold him controlled substances several times over the prior six months.

[43] At that point, the detectives took a break and left the interview room to speak to other witnesses and discuss the case. When they returned to the interview room, Abel told the detectives his parents did not know about the Tracker. The detectives told him that Abel's father, John, had already told them that he helped Abel attempt to hide the Tracker on the property. The detectives accused Abel of deceiving them. After further questioning, Abel admitted that he had lied to Chase's family and friends when he told them that Chase had never arrived at the farm.

[44]  When the detectives told Abel they were going to get a search warrant for Abel's phone, Abel admitted he had texted pictures of the Tracker to his girlfriend sometime after January 31, 2017. Abel denied that he fought with Chase that night or that there had been an accident. The detectives again accused Abel of withholding the truth and told him they would get a search warrant for the farm, including his parents' house.

[45]  At that point, Abel stated for the first time that after he had given Chase the money to buy controlled substances, Chase "for absolutely no reason at all" suddenly pointed his .40 caliber handgun at him and shot at him at least twice. *Id.* at 56:22. Abel claimed that he then positioned himself behind the Tracker before shooting and fatally wounding Chase with Chase's .44 caliber handgun. Abel admitted he did not have .357 handgun and had fabricated his claim that Chase took his handgun. In response to further questions from the detectives, Abel stated that the .44 caliber handgun was hidden in his parents' barn, Chase's other firearms were hidden in the house, and Chase's body was buried on the property. Abel offered no explanation as to why Chase allegedly shot at him, denying that the two men had argued prior to the shooting.

[46]  Abel told the detectives he would be willing to show them where he had shot Chase and buried him. After the interview, Detective Phillips called the Indiana State Police for assistance. At the same time, Greene County police officers obtained a search warrant for the Abel farm. Detective Phillips, Detective O'Malley, Abel, and several other officers from the Indiana State

Police, the GCSD, and the LCSD returned to the farm. The sun had set by the time they arrived on the night of February 4, 2017.

[47] The officers began their search of the farm at the cabin. One of the officers carried a video recorder, and another brought a camera and took photographs. Abel was in handcuffs. The area around the cabin was heavily wooded, and there were no light sources other than what the officers had brought with them. Abel told the officers that Chase's vehicle had been parked in front of the cabin, with the driver's side door facing the cabin. He further stated that Chase had been standing near the front door of the cabin, and Abel had been standing near the Tracker, when they exchanged gunfire. Abel stated Chase shot three times, and he did not remember how many times he fired back after he took cover behind the Tracker. Abel further stated that one of the shots had gone through the Tracker. Several officers later testified that given how dark it was at that location, it was difficult to believe that Abel and Chase could have seen each other well enough to have had a gunfight on the night of January 31, 2017.

[48] At that point, Abel led the officers on foot to another wooded portion of the property, where he showed them a burn pile. Abel explained that he had tied Chase's body to the back of the Tracker with a sheet. He then dragged Chase's body to the site of the burn pile, where he had removed most of Chase's clothes from his body and burned them. Next, Abel then led the officers approximately 380 feet further south to a small, partially dry creek bed. Abel told the officers that he had dragged Chase's body to that spot by hand and had buried him there in a shallow grave.

[49] During the walk, Abel had explained that he left the Tracker in a field and had taken Chase's possessions out of the Tracker the day after he shot him. He also said that he had thought about his "ex" a lot after the shooting. Tr. Vol. 6, State's Ex. 115, at 34:34. He stated she had not been around for months and played no part in the shooting.

[50] After Abel showed the burial site to the officers, the group went to the barn. Abel said he had buried some of Chase's property in the barn's dirt floor and had placed a couch over the spot. He also showed them a chest where he claimed he had placed other items he took from the Tracker.

[51] Next, Abel took them into the house. Abel showed them an upstairs hallway closet, where he had hidden a GPS unit and a tool he had admitted he took from Chase's Tracker. He also opened a vent cover in the hallway. Once the vent was open, the officers had to reach deep into the ducts with implements to retrieve property that Abel admitted he had placed there. The officers retrieved a .40 caliber Ruger handgun, knives, drug paraphernalia, and a holster, all of which Abel conceded he had taken from Chase. Abel had written his initials on the holster.

[52] At that point, Abel led the officers to his bedroom. He pointed out another knife he admitted taking from Chase's vehicle. Abel had written his initials on the knife's handle. Abel also had a sweatshirt in his closet that he admitted belonged to Chase. In addition, inside Abel's closet he had nailed a board over an opening to an adjacent attic space and had placed caulk around the edges of

the board. Abel kicked in the board at the officers' request. The officers searched the attic space and recovered cowboy boots, a pool cue, two rifles, a shotgun, a tool box, and a gun case, all of which Abel admitted belonged to Chase. Abel had written his initials on the tool box and the gun case.

[53] Next, the officers returned to the barn, where they moved a sleeper sofa and dug a hole in the area Abel had identified. They uncovered a red bag and a blue bag. The red bag contained a .44 caliber handgun. Abel had written his initials on the handgun and admitted it belonged to Chase. The red bag contained ammunition, knives, and drug paraphernalia. The blue bag contained what appeared to be a phone charger. Throughout this process, Abel appeared to be "relaxed" and did not show any remorse or sorrow for Chase's death. Tr. Vol. 3, p. 69; Tr. Vol. 4, p. 200.

[54] While the officers searched the house and barn, Detective O'Malley returned to the GCSD offices with Abel and interviewed him at 3:30 a.m. on February 5, 2017.[5] Abel admitted that Chase had traveled to the farm to smoke methamphetamine and to discuss a gun sale. Abel further admitted he did not give Chase $350. He said he had burned Chase's wallet along with Chase's clothes but later used some of Chase's money for cigarettes. He told the detective that he had burned his own clothes as well.

---

[5] At the beginning of this interview and all subsequent interviews, the officers read an advisement of rights to Abel, and he signed the advisement of rights.

[55] According to Abel, the shooting occurred after the two men had fired guns from the back porch of the cabin. Abel said he used a .44 caliber handgun, which he claimed Chase had offered to sell to him for $600. Next, Abel told Detective O'Malley he and Chase walked through the cabin and out the front door, with him in the lead and Chase following. Abel then stated that he turned and saw Chase raising a handgun to point it at him. He next claimed that Chase shot at him as he ran, first behind a tree and then behind the Tracker. Abel asserted that he then picked up the .44 handgun, which, according to Abel, had been on the hood of the Tracker, and shot back, fatally wounding Chase.

[56] After further questioning, Abel conceded that he had been carrying the handgun when he left the cabin because he had been shooting with it from the back porch of the cabin. He next admitted that he shot Chase at least twice before Chase fell to the ground, walked over to where Chase lay, and then shot him once again at close range, while Chase was face down and not moving, but allegedly still holding a handgun in his hand.

[57] Abel insisted he and Chase had not argued or fought, saying "Nothing bad happened between us." Tr. Vol. 6, State's Ex. 129, at 30:55. Abel theorized at one point that Chase may have intended to rob him because he had $500, and he stated that Chase knew it. Abel also said Chase may have pointed the gun at him as "a joke." *Id.* at 39:15. When Detective O'Malley asked him where the $500 had gone, Abel stated that he spent some of the money on ammunition and may have lost the rest on the property or accidentally burned it with the clothing. Abel admitted he had not held a regular job for the past nine months.

[58]	Next, Abel admitted he had photographed the Tracker and texted the photograph to Holland. Later, he conceded he may have shot Chase first after Chase pointed a gun at him. *Id.* at 55:54. He continued to maintain that he shot Chase a final time while Chase lay on the ground.

[59]	Meanwhile, the officers at the farm finished their initial search of the house and barn at 5:00 a.m. on February 5, 2017 and decided to wait until after sunrise to continue searching the outdoor areas of the property. Some officers remained at the cabin to secure the scene, and other officers returned to the farm at 9:00 a.m. to continue the search. The officers sealed the Tracker's doors and had it towed to the Greene County Sheriff's Department. Next, they went to the site where Abel said he had buried Chase's body. They found two shovels nearby. The officers removed enough dirt and other materials to confirm that a body was present and contacted the coroner, who arrived and exhumed Chase's remains.

[60]	Meanwhile, another officer noted a trail between the burn pile and the burial site and observed several spots of what appeared to be blood. The officer also examined the burn pile and found buttons and scraps of fabric in it.

[61]	At that point, other officers went back to the cabin, where they again searched the area using metal detectors. They found two shell casings for .40 caliber rounds near the front door of the cabin. They found a .44 caliber shell casing inside the cabin. There also was a railroad tie embedded in the ground outside the front door of the cabin, with spots of what appeared to be blood on it.

There was no indication that any bullets struck the cabin, despite Abel's claim that Chase had been standing directly in front of it when he was shooting at Chase.

[62] At approximately 2:00 p.m. on February 5, 2017, Detective O'Malley questioned Abel again to follow up on what other officers had learned while searching the cabin. Abel stated Chase fell face down on the wooden railroad tie after he shot him. Also, he claimed that as he tried to take the handgun out of Chase's hand after the shooting, it went off and a bullet went straight into the ground. Abel further asked Detective O'Malley if he hit Chase every time he shot at him. Detective O'Malley stated he did not yet know, but the autopsy would reveal if he did.

[63] On the next day, February 6, 2017, Detective O'Malley questioned Abel at 10:00 a.m. By this time, Abel was in custody and explained where he had disposed of Chase's mobile phone on the farm. He stated he had used Chase's AR-22 rifle to shoot the mobile phone multiple times before throwing it into a field. Abel also repeated his theory that Chase may have intended to rob him. He admitted he had used some of Chase's money to buy ammunition for each of Chase's guns on the day after the shooting. Abel further stated that Chase's keys to the Tracker were in his bedroom, in the pockets of a jacket. He also admitted to Detective O'Malley that his phone would show that he had not spoken with Chase on the day after the shooting, and that he had further texted photos of a gun to a neighbor and photos of a gun and the Tracker to Holland. In addition, Abel explained he had installed scopes on two of Chase's guns after

the shooting. Finally, he told the detective that he had owned the methamphetamine that he and Chase smoked on January 31, 2017. Abel claimed he had bought it from Chase several days prior to the shooting.

[64] Later, on February 6, 2017, officers returned to the Abel farm with Abel, whereby he could assist them in finding Chase's mobile phone and the keys to the Tracker. When they arrived, they found Abel's parents and several of his siblings cleaning out his bedroom. One of Abel's brothers found the keys to the Tracker and a piece of U.S. Mail with Chase's name on it in Abel's room, and he gave it to the officers. Next, Abel took the officers to the field where they found Chase's mobile phone. It had been shot ten to thirteen times, and Abel admitted he had done it and had thrown the mobile phone into the field because he was afraid the police would be able to locate it remotely.

[65] Next, on February 6, 2017, officers examined the Tracker at the Greene County Sheriff's Department. The tie rod for the right front tire was broken, with the tire was pointing sideways, and the left front tire was flat. The vehicle was covered in dirt and mud, and several windows were broken. There were bullet holes both in the driver's side front door and the passenger's side front door. An officer opined that one shot had entered through the driver's side front door, passed through the vehicle, and exited through the passenger's side front door. Both holes were approximately two feet and six inches above ground level, indicating the bullet had traveled along a nearly level trajectory. Officer Jason Cobb estimated that, based on the size of the bullet hole, the round was bigger

than a .22 caliber round but smaller than a shotgun slug, possibly a .40 or .44 caliber round.

[66] Also, on February 6, 2017, Dr. Roland Kohr performed an autopsy on Chase's remains. Dr. Kohr determined Chase's cause of death was homicide by six or seven gunshot wounds. One bullet had entered Chase's right jaw and traveled through his brain stem, and stopped in his skull. This gunshot would, by itself, would have been fatal. Based on the condition of the entry wound, Dr. Kohr concluded the shooter fired the shot at least eighteen inches from Chase, and possibly a little further away.

[67] A second bullet had entered the right side of Chase's body, passing through his neck and spine, and traveling in a downward angle. This gunshot wound, standing alone, also would have been fatal without immediate medical care. Contrary to the head wound, this particular gunshot was a contact wound, meaning that it was fired within a half an inch of Chase's skin.

[68] In addition, there was a third bullet that had entered Chase's liver and stomach on the right side of his body, and that wound also would have been fatal by itself, absent immediate medical treatment. A fourth gunshot perforated Chase's intestines, entering on the right side of his body, and it also would have been fatal without immediate medical care. Chase was shot two or three additional times, but none of those wounds would have been fatal by themselves.

Dr. Kohr was unable to establish whether Chase was shot a total of six or seven times because one of the gunshots struck his arm, and the same bullet could have also entered Chase's torso. Dr. Kohr recovered the bullet that remained in Chase's skull, but the police were unable to locate any rounds that passed through Chase's body. Dr. Kohr could not determine the order in which Chase sustained his wounds. However, he concluded that based on the majority of the bullet entry wounds being inflicted upon Chase's right side, the wounds were inconsistent with being struck while Chase was directly facing another person. In addition, beside the head wound, most of the bullets pierced Chase's body in a downward direction and would have been consistent with Chase lying on the ground while he was being shot.

Dr. Kohr also collected samples from Chase's body for a toxicology screen. The tests revealed Chase had hydrocodone, amphetamine, and methamphetamine in his bloodstream at the time of death. The level of methamphetamine was "very high," reflecting that Chase had ingested or snorted it. Tr. Vol. III, p. 190.

Several officers had collected DNA swabs during the search of the property and sent the swabs to a state laboratory for testing. The parties stipulated that Chase's DNA was found on leaves, grass, and a railroad tie at the cabin, and Abel's DNA was found on the Tracker's driver's side front door handle. In addition, subsequent ballistics testing revealed that the bullet that was found in Chase's brain had been fired by the .40 caliber Ruger handgun that Abel had

hidden in a vent in the Abels' house.  Further, the .40 caliber shell casings that were recovered at the cabin had also been fired by that same handgun.

[72]    Detective O'Malley interviewed Abel a final time on February 6, 2017, at 8 p.m.  He confronted Abel with Dr. Kohr's autopsy report, accusing Abel of lying when he said he shot Chase three times when the autopsy report showed that he shot Chase at least six times.  Detective O'Malley further noted that most of the bullets entered Chase's body from the right side at a downward angle, so he could not have been shot by someone directly facing him.  Abel expressed disbelief that he had shot Chase six times but ultimately acknowledged that he must have shot Chase multiple times as he lay on the ground.  He further said that he "should have bolted and ran" from the confrontation.  Tr. Vol. 6, State's Ex. 131, at 23:59.  Abel again stated there was no quarrel between him and Chase, and that they were friends.  He also repeatedly told the detective that Holland planned to visit him in jail the next day.

[73]    After Abel was incarcerated, he tried to contact Holland by telephone calls and letters every day.  He also asked his parents to contact Holland every day.

[74]    On February 7, 2017, the State charged Abel with murder; obstruction of justice; theft; and false informing, a Class A misdemeanor.  The State further requested a sentencing enhancement, alleging Abel used a firearm while committing a felony that resulted in death or serious bodily injury.

[75] On February 10, 2017, Detective O'Malley and several other officers returned to the farm. John Abel gave them permission to search the property. They examined the burn pile with a metal detector and found a .44 caliber shell casing. They also examined the back of the cabin again and found additional .44 caliber shell casings on the ground. Subsequent testing revealed that the .44 caliber shell casings been fired from the .44 caliber handgun that Abel buried in the barn. They did not find any bullets embedded in the ground in front of the cabin.

[76] The State dismissed the charge of false informing before trial. A jury found Abel was guilty of murder, and also obstruction of justice and theft, both as Level 6 felonies. Next, Abel waived his right to trial by jury on the firearm sentencing enhancement. The parties presented evidence and argument on the enhancement, and the trial court found regarding the enhancement that Abel used a firearm in the commission of a felony, specifically murder.

[77] The trial court sentenced Abel to sixty years for the murder conviction, enhanced by sixteen years for the use of a firearm. The trial court further sentenced Abel to two years for obstruction of justice and two years for theft, both as Level 6 felonies. The trial court ordered Abel to serve all sentences consecutively, for an aggregate sentence of eighty years. This appeal followed.

# Discussion and Decision

## I. Sufficiency of the Evidence – Self-Defense

[78] Abel does not dispute that he shot and killed Chase. He instead argues that his murder conviction must be reversed because the State failed to disprove his claim of self-defense. Self-defense is recognized as a valid justification for an otherwise criminal act. *Miller v. State*, 720 N.E.2d 696, 699 (Ind. 1999). "[I]t is the policy of this state that people have a right to defend themselves and third parties from physical harm and crime." Ind. Code § 35-41-3-2 (2013). Thus, "[a] person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force." *Id.* Further, a person "is justified in using deadly force . . . and . . . does not have a duty to retreat . . . if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person . . . ." *Id.*

[79] The statutory right of self-defense is not unlimited, as the governing statute explains:

> [A] person is not justified in using force if:
>
> (1) the person is committing or is escaping after the commission of a crime;
>
> (2) the person provokes unlawful action by another person with intent to cause bodily injury to the other person; or

(3) the person has entered into combat with another person or is the initial aggressor unless the person withdraws from the encounter and communicates to the other person the intent to do so and the other person nevertheless continues or threatens to continue unlawful action.

*Id.*

[80] In addition, the Indiana Supreme Court has determined, "Self defense is established if a defendant: (1) was in a place where the defendant had a right to be; (2) did not provoke, instigate, or participate willingly in the violence; and (3) had a reasonable fear of death or great bodily harm." *Brown v. State*, 738 N.E.2d 271, 273 (Ind. 2000).

[81] Once a defendant asserts a claim of self-defense, the State must prove that the defendant's use of force was unjustified. *Milam v. State*, 719 N.E.2d 1208, 1210 (Ind. 1999). The State meets this burden by disproving beyond a reasonable doubt at least one element of self-defense. *Id.* The State may carry this burden either by rebutting the defense directly or by relying on the sufficiency of the evidence in its case-in-chief. *Id.*

[82] We review a challenge to the sufficiency of the evidence to rebut a claim of self-defense using the same standard as for any claim of insufficient evidence. *Carroll v. State*, 744 N.E.2d 432, 433 (Ind. 2001). We neither reweigh the evidence nor assess the credibility of the witnesses. *Brown*, 738 N.E.2d at 273. We instead look to the evidence most favorable to the verdict and reasonable inferences drawn therefrom. *Id.* We will affirm the conviction if there is

probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

[83] Abel argues that: (1) he had a right to be on his family's farm; (2) Chase provoked the shooting by Chase pointing a handgun at him; and (3) he had a reasonable fear of death at the hands of a well-armed "drug dealer." Reply Br. p. 5. Viewing the facts in the light most favorable to the judgment, we disagree with Abel's last two points.

[84] At the time of the shooting, Abel had been out of work for nine months and did not have a drivers' license. He relied on his parents for food and shelter. Abel told a detective that he had $500 on the night of the shooting, but there is no evidence in the record to support that amount of money other than his self-serving statement. Further, Abel was despondent that Holland had ended their long-term relationship a month before the shooting and wanted to win her back. He knew Holland liked handguns and four-wheel drive vehicles, and Chase had a .44 caliber handgun and a four-wheel drive Chevrolet Tracker. In addition, Abel told law enforcement that he had thought about Holland a lot in the days after the shooting, and he had repeatedly tried to contact her from jail. There is ample evidence from which a jury could have reasonably inferred that Abel had a motive to kill Chase in an effort to gain his valuable personal property.

[85] The evidence also reveals that Chase had no motive to attack Abel. Further, Chase did not have a reputation for violent behavior or robbery. Also, Abel

repeatedly insisted that he and Chase were friends and had gotten along fine on the night of January 31, 2017, without arguing before the shooting.

[86] Abel's claim that Chase provoked him to shoot Chase is further undercut by the evidence and circumstances of the shooting. Abel's tale of the shooting drastically changed several times during his interviews with law enforcement, but he is essentially claiming that the two men were standing outside the cabin at night when Chase suddenly and unexpectedly pointed a gun at him. Abel then allegedly responded by taking cover behind the Tracker and shooting Chase with the .44 caliber handgun while Chase shot at him through the Tracker's doors.

[87] Evidence was presented that at the site where Abel said the shooting occurred, the cabin lacked electricity and it would have been extremely dark in the woods at night. Further, the bullet that struck the Tracker passed through it at a height of two feet, six inches above ground level, which is inconsistent with being fired by a standing adult. There was no evidence presented to show that Chase fired the .40 caliber handgun at Abel in the manner Abel described to law enforcement. In addition, most of Abel's bullets passed through the right side of Chase's body at a downward angle, which is inconsistent with Abel's claim that he shot at Chase straight on. Dr. Kohr opined that the shots could have instead struck Chase while he was lying in a prone position. Further, although Abel repeatedly told officers that he shot at Chase with the .44 caliber handgun, the bullet that was found in Chase's body had come from the .40 caliber handgun, which Abel said Chase had in his possession. Finally, Abel conceded

at one point that he shot Chase as he lay face-down on the ground, unmoving, however, he could not explain how Chase was shot in the chest at close contact. The jury could reasonably find, based on Abel's numerous lies and inconsistencies, that Chase did not point his handgun at Abel first and that Abel did not have a reasonable fear of harm to himself before shooting and killing Chase.

[88] The jury also heard evidence that after the shooting, instead of telling anyone or seeking help from his family or the police, Abel made extensive efforts to cover up the shooting. He moved the Tracker away from the alleged location of the shooting and attempted to hide and disguise it by removing its license plate and luggage rack. Abel initially attempted to hide the Tracker in a barn, and later in a sunken portion of the farm, behind debris.

[89] In addition, Abel moved Chase's body from the scene of the shooting, stripped clothing from the body, and buried him in a shallow, unmarked grave on a remote portion of the property. He also burned Chase's identification and most of Chase's clothing, along with his own. Abel also destroyed Chase's mobile telephone and hid the murder weapon, along with numerous other items of valuable property that belonged to Chase.

[90] Chase's credibility was a major factor in this case. Abel was caught by various law enforcement officers in numerous lies and inconsistencies about what happened on the night of January 31, 2017. His story constantly changed, from first alleging that Chase was never at the farm, to next claiming that Chase was

there but drove off in the Tracker, to then alleging that Chase was there but left with an unknown woman after the Tracker broke down, to admitting that he shot Chase and buried him on the farm. The jury could have reasonably determined from this evidence that Abel's behavior and conduct was an attempt to destroy incriminating evidence and cover up an unjustified shooting.

[91] The jury also received extensive evidence demonstrating that Abel took Chase's valuable personal property, including guns, knives, clothing, and boots, and claimed those items as his own. On the day after the shooting, Abel and John went shopping, and Abel purchased ammunition for Chase's firearms. In addition, Abel wrote his initials on several items of property and hid them in his bedroom or an adjacent attic. He texted a neighbor to boast that he had acquired several firearms. Next, he also offered the Tracker and the handgun to Holland as a gift to win her affections; claiming at one point that "none of this would have happened if you'd just came [sic] and saw me, I did this for you." Tr. Vol. 4, p. 183. The jury could have reasonably determined that Abel's theft of Chase's personal property, and his attempt to give some of the property to Holland, was proof that Abel intended to murder Chase for his property. Furthermore, Abel was unable to explain how he had not held a regular job for several months before allegedly had $500 when he met with Chase.

[92] Further, the firing of multiple shots belies Abel's claim of self-defense. *Brown v. State*, 738 N.E.2d at 273. Abel shot Chase six or seven times. In addition, one of the bullets that struck Chase in the chest was a contact wound. The jury could have reasonably inferred from that wound that, contrary to Abel's version

of events, Abel either: (1) ambushed Chase in the dark; or (2) shot Chase while he was lying prone on the ground and no longer posed a threat to him. In either case, self-defense would be inapplicable.

[93] Under these extensive facts and particular circumstances, we conclude that the State presented sufficient evidence to the jury to disprove Abel's claim of self-defense. *See King v. State*, 61 N.E.3d 1275, 1284 (Ind. Ct. App. 2016) (State disproved claim of self-defense; autopsy of victim showed that he was shot in a manner that contradicted defendant's version of events; evidence showed defendant had an incentive to take victim's property), *trans. denied*.

## II. Sentencing - Discretion

[94] Abel argues the trial court erred in identifying certain aggravating factors at sentencing and in imposing a sixteen-year sentencing enhancement for use of a firearm. A trial court may impose any sentence that is authorized by statute and permissible under the Constitution of the State of Indiana. Ind. Code § 35-38-1-7.1 (2015). Whenever a trial court imposes a sentence for a felony offense, the sentencing statement must include a reasonably detailed recitation of the trial court's reasons for imposing a particular sentence unless the court imposes the advisory sentence. Ind. Code § 35-38-1-1.3 (2014).

[95] Subject to the review and revise power discussed below, sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind.

2007), *clarified on reh'g*, 875 N.E.2d 218 (2007).  The Indiana Supreme Court has explained:

> One way in which a trial court may abuse its discretion is failing to enter a sentencing statement at all.  Other examples include entering a sentencing statement that explains reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any—but the record does not support the reasons, or the sentencing statement omits reasons that are clearly supported by the record and advanced for consideration, or the reasons given are improper as a matter of law.  Under those circumstances, remand for resentencing may be the appropriate remedy if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record.

*Id.* at 490-91.

[96]     Abel first argues the trial court abused its discretion in determining his criminal record was an aggravating circumstance.  "In determining what sentence to impose for a crime, the court may consider the following aggravating circumstances . . . .  The person has a history of criminal or delinquent behavior."  Ind. Code § 35-38-1-7.1(a).  The significance of a criminal history varies based on the gravity, nature, and number of prior offenses as they relate to the current offenses.  *Gleason v. State*, 965 N.E.2d 702, 712 (Ind. Ct. App. 2012).

[97]     In Abel's case, he had a juvenile adjudication in 2006 for an act that would have constituted burglary, a Class B felony, if committed by an adult.  During sentencing, Detective O'Malley testified, without objection from Abel, that he

had reviewed the records from that case and had learned that Abel had broken into a vehicle and had stolen firearms, among other items. Next, in 2013 Abel was convicted of theft as a Class D felony. Detective O'Malley testified, again without objection from Abel, that he stole a "4 wheeler" and scrapped it for money. Tr. Vol. 5, p. 73. Abel admitted to stealing the vehicle only after several interviews. Finally, in 2015 Abel was convicted of the illegal taking of a wild animal, a Class B misdemeanor. The trial court stated as follows:

> The aggravating factors the Court will find the Defendant's prior history of juvenile adjudications or adult criminal convictions specifically the 28C01-0609-JD-95, adjudication as a juvenile for a Burglary, circumstance which involved dealing with firearms which I do believe is a violent type offense and is relevant and certainly significant aggravating factor with the current offense involving firearms as well the prior adult conviction for Theft under 28C01-1307-FD-127, again a relevant and consistent type prior criminal history to the current offense, defendant did have a conviction for illegal taking of wild game as I believe a B Misdemeanor under 28D01-1412-CM-276 is prior criminal history, but that particular conviction does not have the weight of the other two the adjudication and the theft conviction, I think the consistently [sic] of the particular type of crime of dishonesty and the Burglary involving firearms is again particular relevant to the instant offenses and it is indicative of likelihood of substantial likelihood of reoffending and poor character of the Defendant . . . .

Tr. Vol. 5, pp. 84-85. Based on the evidence presented, we agree with the trial court that Abel's prior convictions, although neither numerous nor as severe as his murder conviction, are significant in relationship to the facts of the current case because they establish Abel's willingness to take property from others, particularly firearms and vehicles, and to lie about it after the fact. Furthermore, Abel's adult criminal history is noteworthy because he appears to have established a pattern of committing criminal offenses (including the current convictions) approximately every two years, demonstrating an unwillingness to conform his behavior to the requirements of the law. The trial court did not abuse its discretion in citing Abel's criminal history as an aggravating factor. *See Field v. State*, 843 N.E.2d 1008, 1011 (Ind. Ct. App. 2006) (trial court properly cited criminal history as aggravating factor in sentence for dealing in controlled substance; prior misdemeanor convictions involving controlled substances were similar in nature), *trans. denied*.

[98] Next, Abel argues the trial court abused its discretion in imposing a sixteen-year sentencing enhancement for use of a firearm. A defendant who is found to have knowingly or intentionally used a firearm in the commission of certain offenses (including murder) may receive a sentencing enhancement of between five and twenty years. Ind. Code § 35-50-2-11.

[99] Abel argues that the trial court should have taken into consideration that Abel did not own the firearm that fired at least one of the bullets that struck Chase (the .40 caliber handgun), and that the handgun was brought to the farm by Chase. We find nothing in the plain language of Indiana Code section 35-50-2-

11 that requires a sentencing court to consider whether a defendant owned the firearm that was used to commit a predicate felony. The statute simply provides additional punishment for those who use firearms to commit certain felonies regardless of the gun's ownership status.

[100] Next, Abel concedes the murder conviction and the sentencing enhancement do not violate "the prohibition against double jeopardy or constitute an illegal double enhancement," but he claims the sixteen-year enhancement is "unduly harsh" because he has already been punished for murdering Chase. We will consider this argument as being relevant to whether the sentence is inappropriate and subject to revision, and address it below. As to whether the trial court properly cited Abel's criminal history as an aggravating factor, we conclude the trial court did not abuse its discretion in imposing a sixteen-year sentencing enhancement under Indiana Code section 35-50-2-11.

## III. Sentencing - Inappropriateness

[101] Abel argues his sentence is inappropriate and asks this Court to revise it to an aggregate sentence of sixty years.

[102] Even when a trial court has acted within its sentencing discretion, article VII, section 6 of the Indiana Constitution authorizes this Court to review and revise sentences. This authority is implemented through Indiana Appellate Rule 7(B), which provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is

inappropriate in light of the nature of the offense and the character of the offender."

[103] As we conduct our review, we consider not only the aggravators and mitigators found by the trial court, but also any other factors appearing in the record. *Walters v. State*, 68 N.E.3d 1097, 1101 (Ind. Ct. App. 2017), *trans. denied*. The appellant must demonstrate that the sentence is inappropriate. *Id.* The principal role of such review is to attempt to leaven the outliers. *Curry v. State*, 90 N.E.3d 677, 691 (Ind. Ct. App. 2017), *trans. denied*. We conduct our sentencing review under Appellate Rule 7(B) with "substantial deference" to the trial court's sentencing decision. *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014).

[104] At the time Abel murdered Chase, the minimum sentence for murder was forty-five years, the maximum sentence was sixty-five years, and the advisory sentence was fifty-five years. Ind. Code § 35-50-2-3 (2015). In addition, for a Level Six felony conviction, the minimum sentence was six months, the maximum sentence was two and a half years, and the advisory sentence was one year. Ind. Code § 35-50-2-7 (2016). As noted above, when enhancing a sentence for use of a firearm under Indiana Code section 35-50-2-11, a trial court may impose an enhancement between five and twenty years.

[105] In this case, the trial court sentenced Abel to sixty years for the murder conviction (five years less than the maximum sentence), enhanced by sixteen years (four years less than the maximum enhancement) for the use of a firearm.

The trial court further sentenced Abel to two years for obstruction of justice and two years for theft (six months less than the maximum for each offense), both of which were Level Six felonies. The trial court directed Abel to serve all sentences consecutively, for an aggregate sentence of eighty years. The trial court thus imposed an aggravated sentence for each offense, but the totality of the sentences is well short of the maximum possible sentence of ninety years.

[106] We begin with the nature of the offenses. Abel characterizes his killing of Chase as the murder of "a drug dealer[ ] during an arranged gun sale when both were heavily under the influence of drugs." Appellant's Br. p. 29. The circumstances of the crime are more troubling than he indicates. According to Abel, he and Chase were friends and got along well. Despite their friendship, it appears Abel killed Chase because he wanted Chase's valuable property, in part for himself and in part to impress his ex-girlfriend, Holland. The forensic evidence indicates Abel shot Chase six or seven times, perhaps with the element of surprise, using Chase's own gun. Instead of ending his criminal conduct after the murder, Abel further desecrated Chase's body by dragging it behind the Tracker for several hundred yards to a location where he stripped most of the clothes from Chase's body; however, choosing to keep Chase's boots and a belt buckle for himself. He then burned Chase's clothes and, purportedly, his own clothes before further dragging Chase's nearly naked body to a dried-up creek bed, where he buried it in a shallow grave. Abel further buried the murder weapon and attempted to hide the Tracker, convincing his father to help him under false pretenses.

[107]   In addition, Abel deployed a staggering array of lies to obstruct the investigation of Chase's disappearance. He lied to Chase's father and friend and told law enforcement ever-changing stories to deflect scrutiny from the farm. Abel displayed absolute disregard for the law, his friend Chase, and for Chase's family by committing these horrific acts.

[108]   In addition, after burying Chase's body in the dried-up creek bed, Abel looted Chase's Tracker of valuable personal property, appropriating its contents for himself. He then offered the Tracker and a handgun to Holland in an attempt to impress and win her affection back; however, he clearly intended to keep the rest of Chase's valuable property for himself. Abel purchased ammunition for Chase's guns the day after the shooting. In addition, he texted a neighbor to inform him that he had obtained some guns and was putting scopes on some of them. Abel went so far as to put his personal initials on many of Chase's items. He placed Chase's boots and a shirt in his own closet. Abel told law enforcement that he was distraught at allegedly having to shoot Chase, but he had no qualms about keeping Chase's personal property, including the murder weapon.

[109]   Next, we turn to Abel's character. He was twenty-five-years old at the time of sentencing. As previously discussed, Abel had a criminal history that, although not particularly extensive, demonstrates that he had no compunction against taking other people's valuable property and lying about it. In addition to his record of convictions, Abel engaged in extensive use of methamphetamine and other drugs since age sixteen, using methamphetamine daily since age twenty-

three. Abel has also used Spice, a synthetic form of marijuana. He had not lived a law-abiding life as an adult for several years.

[110] Abel argues he had a difficult childhood. Evidence of "a difficult childhood warrants little, if any, mitigating weight." *Ritchie v. State*, 875 N.E.2d 706, 725 (Ind. 2007). Further, we cannot conclude he suffered from abuse or neglect. Abel's parents chose to homeschool him. Perhaps this was far from an ideal arrangement, due to Abel's diagnosis of Attention Deficit Hyperactive Disorder, and he may have benefitted more from specialized training and assistance. Instead, when he was thirteen years old he refused to continue his education, although his parents allegedly tried to convince him that it was in his own best interests. As a result, Abel's formal education essentially ended at the sixth-grade level. Nevertheless, the record establishes that Abel's parents loved him and provided a home and for all of his basic needs. There is no evidence that they were abusive or neglectful toward him.

[111] Abel further claims his parents allowed him to begin a romantic relationship with Holland (who is twenty-seven years his senior) when he was under eighteen; however, Holland emphatically denied his assertion and testified that Abel was an adult when they began their relationship. We conclude Abel has failed to meet his burden of establishing that his sentence in this matter is inappropriate.

# Conclusion

[112] For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

Vaidik, C.J., and Kirsch, J., concur.